UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 18-10786-RGS

CARLOS MELO

v.

CITY OF SOMERVILLE and CHIEF DAVID FALLON,
in his official and individual capacity

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

November 25, 2020

STEARNS, D.J.

Carlos Melo, an involuntarily retired police officer, filed the instant action against his former employer, the City of Somerville (City), and his former supervisor, Chief David Fallon, alleging disability discrimination under federal and state law. As relevant here, he asserts six counts against defendants:[1] failure to accommodate an actual (Count I) or perceived (Count II) disability under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, *et seq.*; violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794

---

[1] He also asserted a common-law count of intentional infliction of emotional distress against Chief Fallon (Count VII). The court previously allowed a motion for summary judgment on this claim, however, and Melo did not appeal that portion of the court's ruling. Melo is thus precluded from litigating this claim further.

(Count III); and discrimination based on an actual (Count IV), perceived (Count V), or record of (Count VI) disability under Mass. Gen. Laws ch. 151B, § 4(16).  Defendants move for summary judgment on all six counts.  For the following reasons, the court will allow the motion in part and deny it in part.

## BACKGROUND

The facts, viewed in the light most favorable to Melo as the nonmoving party, are as follows.  Melo began working as a police officer for the City of Somerville in May of 1997.  He injured his left eye while on duty in October of 2002 and underwent multiple surgeries before returning to work (without restriction) in 2003.[2]  In 2007, Melo successfully bid on the position of station officer, which required him to, among other responsibilities, answer police calls, run criminal history checks, and monitor prisoners.  As a station officer, he was still required to be able to perform the essential duties of a police officer.

By August of 2015, Melo had twice tested positive for marijuana use.  After entering into a rehabilitation agreement on the first occasion and being disciplined on the second, he was informed that a third positive test would

---

[2] The parties dispute whether Melo informed his coworkers and supervisors, when he returned to duty, that he could not see out of his left eye.  Pl.'s Resp. to Defs.' Stmt. of Facts (Pl.'s Resp. to Defs.' SOF) ¶ 7 (Dkt. # 50); Ex. 23 to Pl.'s Resp. to Defs.' SOF at 15, 24-28.

result in termination.[3]  On August 25, 2015, Lieutenant William Rymill reported to Deputy Chief Stephen Carrabino that Melo had recently[4] arrived at work smelling of marijuana.  On September 22, 2015, Captain Michael Cabral spoke with Melo about the report.  Melo informed Captain Cabral that he had "lost partial vision in his [left] eye" and that, as a result, he sometimes smoked marijuana to relieve his migraine headaches and pain.[5]  Pl.'s Resp. to Defs.' SOF ¶ 13.

The following day, the City ordered Melo to undergo a drug test and placed him on paid administrative leave pending the results.  After Melo disputed the City's reasonable suspicion for ordering the drug test, the City agreed to hold an appeal hearing on October 1, 2015.  That morning, instead of participating in the hearing, Melo entered into a Settlement and Last

---

[3] The rehabilitation agreement specifically provided that, after testing positive for drug use the first time, Melo would be allowed to "enter a rehabilitation program . . . in lieu of discipline," but it noted that a second positive drug test would "result in disciplinary action" and a third positive drug test would "result in termination." Ex. 7 to Defs.' Stmt. of Facts (Defs.' SOF) ¶ 3 (Dkt. # 42).  Another provision, however, stated that a third positive drug test "*may* result in termination." *Id.* ¶ 10 (emphasis added).

[4] Deputy Chief Carrabino admitted that Lieutenant Rymill was "vague" about the timeframe of the incident and that it could have occurred months earlier.  Ex. 24 to Pl.'s Resp. to Defs.' SOF at 3.

[5] Melo, however, "vehemently" denied ever reporting for duty high during this conversation.  Ex. 8 to Defs.' SOF.

Chance Agreement with the City.[6]  The Agreement required him to, *inter alia*, complete a drug rehabilitation program and pass a fitness for duty test. It also specified that any failure to abide by these terms would "subject the employee to termination." Ex. 9 to Defs.' SOF ¶ 16.

Dr. Albert Rielly performed Melo's fitness for duty test on October 15, 2015.  In his report to the City, he wrote that Melo had "significantly decreased visual acuity in his left eye to the point of almost monocular vision, decreased binocular vision and decreased visual fields." Ex. 10 to Defs.' SOF at 1.  He expressed concern about the impact these impairments would have on Melo's work performance, noting that "[v]ision is critical to safe and effective performance of many law enforcement officer job functions." *Id.* He also expressed safety concerns about Melo's marijuana use, noting that medical evidence did not support the use of marijuana to treat migraine headaches and that marijuana use was associated with several adverse effects "contraindicated in the essential job tasks of a police officer." *Id.* at 2.  He ultimately opined that Melo was "unfit for duty at this time until he obtains a formal ophthalmological evaluation including formal field testing." *Id.*

---

[6] Melo formally signed the Agreement on October 2, 2015.  Pl.'s Resp. to Defs.' SOF ¶ 17.

Melo followed up with Dr. Steven Patalano, an ophthalmologist, on December 3, 2015.[7] Dr. Patalano reported that Melo could "see[] nothing" from his "aphakic"[8] left eye and that his condition was permanent. Ex. 30 to Pl.'s Resp. to Defs.' SOF at 2, 4. Based on Dr. Patalano's observations, Dr. Rielly concluded that Melo's visual impairments would "interfere[] with him safely performing" the essential function of operating a vehicle at a high rate of speed as required for pursuit driving . Ex. 11 to Defs.' SOF.

Because Dr. Rielly did not find Melo fit for duty, Chief Fallon issued a disciplinary letter to Melo on January 7, 2016. In that letter, Chief Fallon suspended Melo without pay for five days. He also notified Melo that the City would hold a hearing "to determine if a greater penalty up to and including termination is justified" for Melo's breach of the Agreement and indicated that he would be requesting termination. Ex. 31 to Pl.'s Resp. to Defs.' SOF.

In February of 2016, Melo sent a letter to the City requesting that it postpone his disciplinary hearing and schedule a meeting to discuss reasonable accommodations – for example, a light duty assignment – that

---

[7] Dr. Patalano's evaluation did not include any formal field testing, despite Dr. Rielly's request for a "formal ophthalmological evaluation *including formal field testing*." Ex. 10 to Defs.' SOF at 2 (emphasis added).

[8] Aphakia is a condition in which the lens of the eye is missing.

5

might allow Melo to continue working as a police officer. The City agreed to postpone the hearing but did not act on Melo's request for a meeting. Melo repeated his request for an accommodation meeting in April of 2016, but he did not receive an answer.

In lieu of termination, Melo ultimately agreed to allow the City to file for involuntary accidental disability retirement on his behalf.[9] The City submitted an application to the Somerville Retirement Board on July 19, 2016. The Public Employee Retirement Administration Commission (PERAC) approved that application on March 1, 2017.[10]

On October 23, 2017, Melo filed charges of discrimination with the Massachusetts Commission Against Discrimination (MCAD) and the Equal Employment Opportunity Commission (EEOC). He later withdrew his administrative charges and initiated this action in federal court. Following the completion of discovery, defendants moved for summary judgment. The court allowed the motion, ruling that Melo had failed to establish a prima facie case that he was able to perform the essential functions of a police officer, even with a reasonable accommodation, given his visual

---

[9] Melo contends that he was threatened and coerced into agreeing.

[10] Melo did not oppose the application before the Board or PERAC, nor did he appeal PERAC's ultimate decision to approve the application.

impairments. The First Circuit vacated the court's order and remanded for further proceedings, determining that Melo had produced sufficient evidence to create a genuine dispute of material fact on the issue of his fitness for duty. With the Circuit Court's permission, defendants now move for summary judgment on alternative grounds.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). "'[T]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### a. Individual liability

Defendants argue that they are entitled to judgment as a matter of law on the portions of Counts I through VI asserted against Chief Fallon in his individual capacity because federal and state law do not provide for

individual liability under these circumstances.  The court agrees.  The First Circuit determined in *Roman-Oliveras v. Puerto Rico Elec. Power Auth.*, 655 F.3d 43 (1st Cir. 2011), that the ADA does not authorize individual liability actions, *see id.* at 52 (concluding that "Title I of the ADA, like Title VII of the Civil Rights Act, addresses the conduct of employers only and does not impose liability on co-workers" (internal quotation marks omitted)), quoting *Fantini v. Salem State Coll.*, 557 F.3d 22, 31 (1st Cir. 2009), and its conclusion applies in equal respect to § 504 of the Rehabilitation Act, *see* 29 U.S.C. § 794(d) (noting that "the standards used to determine whether [§ 504 of the Rehabilitation Act] has been violated in a complaint alleging employment discrimination . . . shall be the standards applied under" the ADA).

Chapter 151B, in contrast, does provide for individual liability in some circumstances.  But Melo has not shown that the section upon which he relies – § 4(16) – constitutes one of those circumstances.  Indeed, the plain text of § 4(16) appears to suggest the opposite.  It refers only to "any employer," *not* to "any person" or "employer."[11]  *Compare* Mass. Gen. Laws ch. 151B, § 4(16),

---

[11] Although § 4(16) refers to "any employer, personally or *through an agent*," Mass. Gen. Laws ch. 151B, § 4(16) (emphasis added), the court disagrees that this language compels a finding of individual liability.  In *Roman-Oliveras*, the First Circuit declined to impose individual liability under the ADA despite the inclusion of "any agent" in the definition of

8

*with id.* §§ 4(4), 4(4A), 4(5). The court accordingly enters summary judgment against Melo on the portions of Counts I through VI asserted against Chief Fallon in his individual capacity.

### b. Timeliness

Defendants next argue that they are entitled to summary judgment on the remaining portions of Counts I through VI because Melo's claims are untimely. Specifically, they contend that because Melo filed charges of discrimination with the MCAD and the EEOC on October 23, 2017, he is barred from pursuing any acts of alleged discrimination that occurred more than 300 days before he filed the administrative charges. *See* 42 U.S.C. § 2000e–5(e)(1); Mass. Gen. Laws ch. 151B, § 5; *see also, e.g.*, *Mekonnen v. OTG Mgmt., LLC*, 394 F. Supp. 3d 134, 149 (D. Mass. 2019). Thus, in

---

"employer," reasoning that the reference to "any agent" "does not connote individual liability" but instead establishes the contours of an employer's vicarious liability. *See* 655 F.3d at 52, quoting *Fantini*, 557 F.3d at 30. Applying that logic here, *see Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 20 n.5 (1st Cir. 2002) (noting that the Massachusetts statute "tracks the ADA in virtually all respects"), the court determines that the reference to "any employer, personally or through an agent" in § 4(16) simply serves to establish *respondeat superior* liability for the actions of an employer's agents. *Cf. Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 816 n.5 (1997) (noting that, in construing Chapter 151B, Massachusetts courts are guided by case law construing the federal Rehabilitation Act and the ADA); *see also Garrity v. United Airlines, Inc.*, 421 Mass. 55, 59 (1995) (same). *But see Beaupre v. Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 491 n.16 (2000) (suggesting that § 4(16A), which refers to an "employer, personally or through its agents," establishes individual liability).

defendants' view, Melo may only recover for discriminatory acts occurring on or after December 27, 2016, while the conduct alleged against defendants took place prior to that date.

The court disagrees that Melo's claims are untimely as a matter of law. A cause of action for disability discrimination generally "accrues on the date of the alleged unlawful employment practice." *See Fletcher v. Tufts Univ.*, 367 F. Supp. 2d 99, 107 (D. Mass. 2005); *see also Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 641 (2004). "In some instances, the precise moment of the 'act of discrimination' is easy to calculate: plainly, if an employee is denied a promotion on an improper basis, the date of the 'act of discrimination' is the date of that denial." *Ocean Spray*, 441 Mass. at 641. In other instances, however – for example, when "the improper conduct continues or evolves over a course of time" – the "date of the 'act of discrimination' is more difficult to determine." *Id.*

The relevant act in this case is Melo's involuntary retirement,[12] which defendants put in motion in July of 2016 and which PERAC approved in

---

[12] To the extent that Melo seeks to recover damages for having to undergo a fitness for duty evaluation or for having been suspended, his claims are untimely. The relevant causes of action accrued in January of 2016, when the evaluation occurred, and when the suspension was imposed. *See Mekonnen,* 394 F. Supp. 3d at 151 (noting that the continuing violation

March of 2017.<sup>13</sup>  Although defendants submitted the retirement application prior to December 27, 2016, a reasonable juror could find that the application did not crystallize into a concrete injury until PERAC approved it in March of 2017.  *Cf. Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 55 (1st Cir. 1999) ("The notice of the layoff is the date on which the limitations period began to run because Thomas's low appraisal scores first resulted in concrete injury in 1993 when they led to her layoff.").  Melo, after all, was not constructively discharged until the moment PERAC approved his involuntary retirement.

For the same reason, the court cannot conclude as a matter of law that Melo's failure to accommodate claims accrued prior to December 27, 2016.  Melo sent letters requesting to meet with defendants to discuss the

---

doctrine does not apply to "discrete acts that occur on a particular day").  The court notes, however, that it is not addressing the admissibility of these acts at any future trial.  It reserves for a ruling on a motion in limine the issue of whether these acts would constitute "'background evidence in support of a timely claim' for wrongful termination."  *See id.*, quoting *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 142 (1st Cir. 2009).

<sup>13</sup> Defendants argue that they cannot be held responsible for Melo's involuntary retirement because the Board and PERAC are independent agencies that operate separately from the City.  But the court declines to enter summary judgment on this ground.  A reasonable juror could determine from the fact that defendants initiated the relevant proceedings and compiled the list of essential functions used by the Board and PERAC to assess Melo's ability to perform his duties that defendants bear responsibility for the ultimate approval of Melo's involuntary retirement application.

11

possibility of reasonable accommodations[14] in February and April of 2016. An employee's "request for an accommodation . . . triggers the employer's obligation to participate in the interactive process of determining" whether a reasonable accommodation is available, and any refusal by the employer to participate in this process is indisputably a violation of anti-discrimination laws. *See Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 457 (2002), quoting *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996). It is not always a simple task, however, to determine when an employer has categorically refused to participate in the interactive process. An employer may explicitly deny a request for a meeting, making the date of the "act of discrimination" clear, but it may also equivocate or, as occurred here, simply fail to act. *See Ocean Spray*, 441 Mass. at 645. In the latter circumstances, courts generally hold that the employee's claim does not accrue until the moment "the employee knew or reasonably should have been

---

[14] As the court noted in its prior order, Melo only requested a light duty work assignment as a reasonable accommodation. He never asked for permission to use marijuana (on or off duty) as an accommodation. And in any event, even had Melo requested it, the court is not convinced that permitting a police officer to use marijuana would be a reasonable accommodation. Federal law prohibits gun possession by an unlawful user of a controlled substance, 18 U.S.C. § 922(g), so any permission given by the City for Melo to use marijuana would presumably expose it to federal litigation.

12

aware that the employer was unlikely to afford him a reasonable accommodation." *Id.*

Here, a reasonable juror could find that Melo did not know or have reason to know that defendants would not afford him a reasonable accommodation prior to December 26, 2017. Although defendants submitted the involuntary retirement application in July of 2016, the Board and PERAC were under no obligation to approve that application and could have decided to deny it at any stage in the proceedings. Melo, in other words, could not know with any certainty the outcome of the proceedings until PERAC approved the application in March of 2017. And that being the case, Melo could have reasonably expected that the submission of the application merely delayed the interactive process of determining whether reasonable accommodations were available and that, if PERAC denied the application, the process would resume. The court accordingly declines to enter summary judgment in defendants' favor on timeliness grounds.

### c. Preclusion

Defendants alternatively assert that they are entitled to judgment as a matter of law on preclusion grounds. Specifically, they contend that Melo is estopped from arguing in this case that he could perform the essential

13

functions of his position because the Board and PERAC reached a contrary conclusion during his involuntary retirement proceeding.

A court may give conclusive legal effect to a determination made in a prior proceeding if: (1) the prior adjudication resulted in "a final judgment on the merits"; (2) "the party against whom estoppel is asserted was a party (or in privity with a party) to the prior adjudication"; (3) "the issue in the prior adjudication is identical to the issue in the current litigation"; and (4) "the issue decided in the prior adjudication was essential to the earlier judgment." *See McLaughlin v. City of Lowell*, 84 Mass. App. Ct. 45, 56 (2013), quoting *Porio v. Dep't of Rev.*, 80 Mass. App. Ct. 57, 61-62 (2011). Here, the court is unpersuaded that defendants have made the requisite showings as to the third and fourth elements. It is not clear, for example, that the Board and PERAC decided an issue identical to the issue raised in this case. These agencies addressed whether Melo could perform the essential functions of a police officer generally, *not* whether Melo could perform the essential functions with a reasonable accommodation. *See Sheehan v. Marr*, 207 F.3d 35, 40 (1st Cir. 2000). It is also not clear that the Board or PERAC sufficiently explained the basis for any conclusion that Melo could not perform these essential functions. The doctors who sat on Melo's medical panel disagreed about whether it was his visual impairments or his

marijuana use that would that would impair his performance (and presumably as a result disagreed as to which essential functions he could not perform),[15] and the Board and PERAC did not specify on which of the two opinions they relied in approving the application. Thus, there appears to be two possible routes to the same conclusion – and if there are two possible routes, neither one alone is essential to the judgment.[16]

In any event, even if defendants could establish the *permissibility* of applying collateral estoppel on these facts, the court would nonetheless decline to rely on the doctrine because it is not convinced that Melo had a full

---

[15] Dr. Sutcliffe, for example, saw "no reason [Melo] could not drive a motor vehicle or use a firearm, even in an emergency situations," but opined that "[r]egular use of medical marijuana would likely prevent him from adequate performance of his duties." Ex. 15 to Defs.' SOF at 9. Dr. Schonwald, in contrast, reported that Melo's visual impairments would limit his ability to see threats or engage in "pursuit driving" but "believe[d]" that his marijuana use was "completely immaterial in this matter." *Id.* at 31.

[16] As defendants note, "the decision of the Regional Medical Panel may be by majority." Defs.' Mot. at 13 n.4, citing Mass. Gen. Laws ch. 32, § 7. But the relevant provision provides only for "certification of . . . incapacity by a majority of the physicians on such medical panel . . . that such member is unable to perform the essential duties of his job and that such inability is likely to be permanent." It does not specify that the physicians must agree as to their underlying reasons for concluding that an employee is unable to perform the essential duties of the job. And defendants do not offer any case law establishing such a requirement. The court thus declines to presume for preclusion purposes that the Board and PERAC relied on the findings of the two doctors opining that Melo's visual impairments would prevent him from performing the essential duties of a police officer as opposed to the third doctor who did not.

15

and fair opportunity to litigate the issue before the Board and PERAC. *See McLaughlin*, 84 Mass. App. Ct. at 56 ("The guiding principle in determining whether to allow defensive use of collateral estoppel is whether the party against whom it is asserted lacked full and fair opportunity to litigate the issue in the first action or [whether] other circumstances justify affording him an opportunity to relitigate the issue." (internal quotation marks omitted) (alteration in original)), quoting *Martin v. Ring*, 401 Mass. 59, 62 (1987). In the civil litigation context, a plaintiff can introduce evidence relevant to the essential functions of a position. *See Gillen*, 283 F.3d at 25 (noting that courts may consider "evidence of the amount of time spent performing the particular function, the consequences of not requiring the applicant to perform the function, and the past and current work experience of incumbents in the job (or in similar positions elsewhere) . . . . to ensure that an employer's asserted requirements are solidly anchored in the realities of the workplace, not constructed out of whole cloth"). By contrast, in the involuntary retirement context, "[t]he determination of what constitutes an essential duty of a job or position is *to be made by the employer*, based on all relevant facts and circumstances and after consideration of a number of factors."[17] 840 CMR 10.21 (emphasis added). The regulations governing

---

[17] This provision further states that, "[i]f the State Human Resources

involuntary retirement proceedings also do not furnish employees with any avenue to challenge the substance of the conclusions reached by the medical panel, as for example, by submitting medical evidence to the contrary. The court therefore cannot say, as a matter of law, that Melo had sufficient opportunity to litigate his ability to perform the essential functions of the police officer position before the Board or PERAC.[18]

Finally, the court finds it significant that Melo could not have raised the specific issue of discrimination at any earlier point in the proceedings. Administrative exhaustion is a prerequisite to pursuing a discrimination claim in federal or state court, and Melo had not yet filed a charge of discrimination before MCAD or EEOC at the time the relevant appeal period expired. *See Sheehan*, 207 F.3d at 40-41 (rejecting the suggestion that the

---

Division has promulgated or promulgates a list or description of essential duties for a position that is consistent with those of the member's position, the employer shall submit such list or description as the essential duties for the position in question." *Id.* In other words, the Board and PERAC treat as dispositive the same HRD list which the First Circuit declined to so recognize.

[18] Moreover, it is not clear that, even if he had the opportunity to litigate the issue, Melo had sufficient incentive to do so. If Melo, as he asserts, only agreed to involuntary retirement because he had been threatened with termination – which would have had adverse effects on his pension – it would work against his interests to argue that he could perform the essential functions of his job before the Board or PERAC. Denial of the involuntary retirement application, after all, would only lead to the threatened termination.

plaintiff "could have raised the issue of disability-based discrimination under the ADA in his statutory appeal from the retirement determination"). Even setting the exhaustion requirement aside, however, the court cannot see how an appeal of the PERAC decision would have allowed him to litigate the substance of his discrimination claims. In an appeal from a PERAC decision, the court's review is limited to determining if substantial evidence supported PERAC's findings. The court accordingly declines to enter judgment against Melo on preclusion grounds.

## ORDER

For the foregoing reasons, the motion for summary judgment is ALLOWED in part and DENIED in part. The court enters judgment against Melo on the portions of Counts I through VI premised on Chief Fallon's liability as an individual. The remaining portions of Counts I through VI survive this motion, and the clerk will schedule the case for trial.

SO ORDERED.

/s/ Richard G. Stearns___
UNITED STATES DISTRICT JUDGE

18